UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. )
) Case No.: 23-cr-10202-FDS
)
STACIE-MARIE LAUGHTON )
)

## DEFENDANT'S SENTENCING MEMORANDUM

Stacie Laughton is a complex 42-year-old woman. She lived a complicated childhood that consisted of ████████ and several inpatient mental health treatments. Despite these challenges, she became a public servant and an ordained minister who championed civil rights including transgender rights and stood for increased minimum wage and mental health care for college students.

Ms. Laughton comes before the Court with a deep understanding and remorse for the hurt her actions caused the victims in this case. This is highlighted by her several attempts to alert authorities of her co-defendant's behavior and her continued voluntary cooperation with officers. She has not once skirted the truth with officials, as her co-defendant has; instead, she has truthfully acknowledged the gravity of her actions for what they are: horrendous, reprehensible, and shocking.

While Ms. Laughton's behavior related to these crimes is utterly inexcusable, it is important that if justice is to be served, she is not to be punished harsher than her co-defendant. Her co-defendant, Groves, took advantage of her position as a trusted lead teacher. She selected and targeted specific vulnerable children under her care to commit this crime. She physically manipulated their clothing to take the pictures. She evaded accountability and responsibility by

1

repeatedly lying to her supervisors and law enforcement. In stark contrast, Ms. Laughton came

forward and took the affirmative step to inform Groves' supervisors and the police. Affirmative

disclosure, cooperation with law enforcement with detailed information including inculpatory

evidence must be considered when determining relative culpability between co-defendants.

*United States v. Romero*, 906 F.3d 196, 212-13 (1st Cir. 2018).

Ms. Laughton has pled guilty to three counts of Sexual Exploitation of Children in

violation of 18 U.S.C. § 2251(a)&(e). Each count carries a mandatory minimum of 15 years. Ms.

Laughton provides this memorandum to assist the Court in sentencing her fairly, consistent with

her lesser culpability than Groves. For the reasons that follow, Ms. Laughton submits that a

sentence of 210 months in prison followed by 5 years of supervised release is sufficient but no

greater than necessary to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

The recommended sentence of 210 months falls under offense level 34 and criminal history

category three, which is consistent with the applicable guideline range if the Court subtracts the

enhancements applied only to Groves for abuse of position of authority and engaging in a pattern

of dangerous conduct.[1] If the Court is not so inclined to sentence her to the minimum mandatory,

15 years on each count, to be served concurrently, Ms. Laughton requests the Court to impose a

sentence not exceeding 216 months followed by 5 years of supervised release.

## I.    18 U.S.C. 3553(a): HISTORY AND CHARACTERISTICS OF STACIE LAUGHTON

### A.  Childhood, Education, and Family Life

Ms. Laughton is 42 years old and has resided in Nashua, New Hampshire most of her

life. She was born prematurely, likely being the cause of many of her psychiatric disorders and

---

[1] Note that Groves received 262 months (21.8 years) and 60 months (5 years) supervision for three counts of Sexual Exploitation of Children and one count of Distribution of Child Pornography.

developmental delays.[2] She was born to Barry Charles Laughton Sr. (deceased) and Nancy

Laughton (70). She has two siblings, Nathan Laughton (28) and Glorya Laughton (unknown).

Ms. Laughton's father worked a series of entry level positions in various stores throughout her

life, such as Dunkin Donuts and Walmart, while Nancy Laughton stayed at home.[3] Ms. Laughton

and her father have always had a rough relationship as he experienced substance abuse and

mental health issues.[4] She is estranged from both of her siblings, although they used to be close.[5]

Her mother remains the only family member she is close with, despite her initially being

unsupportive of her gender identity.[6]

From a young age, Ms. Laughton experienced ████████ At age four her neighbor

molested her.[7] She was sexually abused again at age 10 by a staff member and her roommate

while attending an inpatient mental health facility, and her "parents removed [Stacie] due to the

██████████ [8] Both times, she reported the issue, but little was done to mitigate the harmful

effects of her abuse.

Growing up, Ms. Laughton has also experienced various learning challenges. Due to Ms.

Laughton's developmental delays, speech, behavioral, and comprehension problems, she

attended a special needs school.[9] On many occasions, Ms. Laughton attended residential

---

[2] See, *Institute of Medicine (US) Committee on Understanding Premature Birth and Assuring Healthy Outcomes; Behrman RE, Butler AS, editors. Preterm Birth: Causes, Consequences, and Prevention. Washington (DC): National Academies Press (US); 2007. Chapter 11, Neurodevelopmental, Health, and Family Outcomes for Infants Born Preterm*, where it mentions "These dysfunctions include language disorders, learning disabilities, attention deficit-hyperactivity disorder, minor neuromotor dysfunction or developmental coordination disorders, behavioral problems, and social-emotional difficulties. Preterm infants are more likely to have lower intelligence quotients and academic achievement scores, experience greater difficulties at school, and require significantly more educational assistance than children who were born at term."
[3] Presentence Investigation Report at 31.
[4] *Id.*
[5] *Id.*
[6] *Id.* at 32.
[7] *Id.*
[8] *Id.*; Psychological and Psychosexual Evaluation Report at 7.
[9] Presentence Investigation Report at 32.

programs including Brookside Hospital in Nashua,[10] New Hampshire, Anna Philbrook Center in Concord, New Hampshire, Brattleboro Retreat in Brattleboro, Vermont, Lake Grove School, Genesis Hospital, and Concord Hospital, instead of traditional school due to her extensive mental health issues.[11]

Her delays manifested in disruptive behavior and an inability to read until junior high school.[12] Her mother indicated that Ms. Laughton was elated when she finally learned to read.[13] Despite these challenges, Ms. Laughton successfully received her high school diploma in 2001.[14] She attended Theology school from 2002-2004, but did not become an ordained minister until 2021.[15] She also completed an associate's degree in Culinary Arts, but the school has since shut down.[16]

Despite all of these challenges, Ms. Laughton was able to find connection through her marriage to Lisa Laughton in 2005. Through this relationship, Ms. Laughton was able to demonstrate her caring side that she was not able to show throughout her childhood due to tumultuous relationships and unstable household. Lisa was disabled and obese and unable to care for herself, therefore Ms. Laughton cared for her as best as she could. When Lisa died unexpectedly in 2020, Ms. Laughton blamed herself for not taking better care of Lisa. This event exacerbated Ms. Laughton's experiences with mental health issues.[17]

---

[10] At age 11, Stacie had hernia due to how aggressively and forcefully she was restrained at Brookside. Additionally, note that this facility has since closed due to the widespread abuse that occurred there.

[11] Presentence Investigation Report at 32; Psychological and Psychosexual Evaluation Report at 4-11.

[12] Presentence Investigation Report at 41; At age 12 Stacie took an IQ test, and her IQ "places [her] at a first grade level for spelling, reading and arithmetic.

[13] Presentence Investigation Report at 41.

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17] Presentence Investigation Report at 34. "The defendant advised that they thought Lisa had the flu, so her death came as a shock," and "According to MDC Brooklyn records, the defendant has struggled with feelings of guilt related to Lisa's death."

In addition to taking care of Lisa, Ms. Laughton served her community in other respects. She was an unpaid public servant in the New Hampshire House of Representatives where she supported bills to raise the state's minimum wage, require public colleges and universities to implement peer support groups for people experiencing mental illness, and a house resolution that called for the federal government to construct permanent storage for nuclear waste.[18] She also started a podcast called SLL Radio & Media as an extension of her public service where she discussed various political issues. In another respect, Ms. Laughton was trained as an ordained minister. Each of these positions were unpaid or very minimally compensated. Ms. Laughton undertook all of these tasks because of her passion to help others inside of her community.

### B.   History of Mental Health, Substance Abuse, and Developmental Issues

One of the few consistencies in Ms. Laughton's life is her challenges with mental health illnesses. She began receiving mental health treatment at the age of four and has been in and out of extensive treatment programs ever since.[19] As a child she was diagnosed with ADHD, Autism Spectrum Disorder, and Impulsivity Disorder, and began self-harming in early adolescence.[20] At age 15, when she was unresponsive to all ADHD medications, she was diagnosed with additional mental health disorders including: bipolar disorder, chronic anxiety disorder, and complex PTSD.[21] It was later reported that her Autism Spectrum Disorder may actually be a nonverbal learning disability.[22]

---

[18] Presentence Investigation Report at 42. See bills that Ms. Laughton Supported: https://www.billtrack50.com/billdetail/1408108; https://www.billtrack50.com/billdetail/1408684; https://www.billtrack50.com/billdetail/1408296.
[19] Presentence Investigation Report at 37.
[20] *Id*.
[21] *Id*.
[22] *Id*.

At age 10, Ms. Laughton experienced her first inpatient treatment. From 10 to age 18, she was admitted to 6 inpatient mental health facilities.[23] Ms. Laughton noted that she was actually admitted to two more throughout this time period.[24] As a teenager, she was also taken to a youth detention center after getting in a fight with her father. There, she was refused her prescription medication and adequate food, told to "shut the fuck up" by staff, and completely isolated for three weeks.[25] During her isolation she was forced to urinate on the floor due to the inadequate access to the bathroom the facility gave her.[26] ███ ████████████████████████████████ staff and her roommate.[27] Her experiences of solitary confinement, ████████ and other similar forms of abuse at mental health facilities further contributed to her mental health struggles.

Around age 18, Ms. Laughton was asked to leave her parents' home.[28] In adulthood, she has been admitted to inpatient care 7 different times.[29] Many times, these visits were for suicidal ideations or because her "bipolar was acting up," likely meaning she was experiencing mania.[30] Throughout adulthood, she continued to engage in self harm and in March of 2015 she attempted to take her own life.[31]

Coupled with her mental health issues, Ms. Laughton also suffers from substance use disorder. She began abusing substances as a teen.[32] By the age of 21 she drank regularly, and

---

[23] *Id*. at 38.
[24] *Id*.
[25]  Presentence Investigation Report at 33.
[26] *Id*.
[27] *Id*. at 32.
[28] *Id*. at 38.
[29] *Id*.
[30] *Id*.
[31] *Id*.
[32] *Id*. at 40.

prior to her arrest she was drinking daily.[33] At age 18, she began to experiment with marijuana, and became a daily user at 34 and remained one until arrest.[34] Ms. Laughton began to experiment with harder drugs at age 25, including: Oxycodone, OxyContin, a morphine prescription pill, mushrooms, LSD, and Ketamine.[35] When Lisa died, Ms. Laughton noted that her use of drugs became a problem.[36] She reported using pills "a few" times a day and using LSD or mushrooms about 4 times a week until her arrest for the present offense.[37] A month prior to her arrest she used heroin for the first time.[38] While in custody, Ms. Laughton requested Medication Assistance Treatment and showed an interest in substance abuse programming.[39]  Her mother notes that she has always had mental health issues but she would never do anything bad.[40]

### C.  Evaluation By Dr. Joseph Plaud Shows Normal Sexual Interests

Dr. Joesph Plaud has experience in conducting assessments on suspected and convicted sexual offenders since 1987.[41] He evaluated Ms. Laughton's mental and psychosexual status over three different meetings.[42] He made many professional findings including: "that there are unique interpersonal issues in Ms. Laughton's social functioning, including what most accurately from a psychological perspective can be described as severe deficits in her interpersonal functioning and reality testing,"[43] and:

> "Ms. Laughton's psychological functioning involves a negative self-image, significant social inadequacies, and evidence for a variety of maladaptive behavior patterns aimed at controlling mood and anxiety. Further, she evidences odd patterns of thinking,

---

[33] *Id*.
[34] *Id*.
[35] *Id*.
[36] *Id*.
[37] *Id*.
[38]  Presentence Investigation Report at 40.
[39] *Id*. at 41.
[40] *Id*. at 33.
[41] Dr. Joesph Plaud's psychology examination on Ms. Laughton at 29.
[42] *Id*. at 1.
[43] *Id*. at 2.

hypersensitivity to criticism or rejection, difficulties managing interpersonal relationships, feelings of social withdrawal, anxious and depressive concerns."[44]

Dr. Plaud also made findings regarding Ms. Laughton's history of ███████████ He wrote,



"[46] He came to this conclusion using the Trauma Symptomatology Scale and the Trauma Potentiators Scale in which she scored a moderate concern and a severe concern on. [47]

Dr. Plaud also confirmed Ms. Laughton's developmental delays. Medical records indicate that Ms. Laughton suffers from "minimal cerebral dysfunction related to anoxic birth injury."[48] Ms. Laughton's medical records also corroborated her longstanding intellectual issues, "it would not be surprising given that [Stacie] is functioning in the borderline level of intellectual disability with an IQ in the mid-70's and given the fact that he has been so frequently in and out of psychiatric hospitals, that his IQ would eventually drift downward into the range which might suggest retardation."[49]

Using his experience and education, Dr. Plaud conducted the Abel Assessment for Sexual Interest, which is a "computer-based assessment system that analyzes and indirectly measures

---

[44] *Id.*
[45] *Id.* at 18.
[46] Dr. Joesph Plaud's psychology examination on Ms. Laughton at 2.
[47] *Id.* at 28.
[48] *Id.* at 8.
[49] *Id.*, Medical records from 1999 by Dr. King.

the relative strength of normal and deviant sexual interests. Research has demonstrated its reliability, validity, and resistance to faking, and its correlation with the extensively used penile plethysmography procedure."[50] Using his expertise, experience and the results of this test, Dr. Plaud came to the conclusion that "Ms. Laughton's sexual interest pattern is exclusive to adult females, evidencing normative sexual interests."[51] This finding shows both how caught up Ms. Laughton was in her relationship with Groves that she participated in activity counter to this and is important an important factor in considering whether Ms. Laughton would be a future threat upon release.

## II. FAIRNESS REQUIRES MS. LAUGHTON RECEIVES A SENTENCE BELOW THE SENTENCE HER CO-DEFENDANT GROVES RECEIVED

### A. Groves Used her Position of Authority to Commit a Heinous Crime and Continues her Manipulation to Deflect Responsibility by Blaming Ms. Laughton for Her Own Actions

Groves was the sole producer of the child pornography which she directed at her place of work. Despite Groves' position as Lead Teacher, responsible to "play with kids and make sure they're safe," she chose to abuse her position to exploit the children under her care and to stage and capture inappropriate photos.[52] The government itself noted that it is irrelevant whether Groves was taking the photos for her own sexual gratification or for another's, "what matters is that—for whatever reason—the [she] is the *one* who chose which children to target, who led those small children into the only bathroom that would shield her actions from the other adults,

---

[50] Dr. Joesph Plaud's psychology examination on Ms. Laughton at 28.

[51] *Id*.

[52] *See*, 095111866110 (Groves police interview) at 12.; 095111866108 (Government's motion for revocation of release) at 3.

who manipulated their clothing, who took pictures of their genitalia, and who distributed those pictures."[53] She knew these children by name. She knew their parents. She spent many hours in close proximity with them. Yet, she callously committed the crime.

Contrary to Groves' assertion that she was manipulated to commit the crime, the text exchanges show she was the one who was providing assurances and encouragement when Ms. Laughton tried to distance herself from Groves' offensive activity. Groves tried to assure Ms. Laughton that there was nothing wrong with her actions.

In 2022, Ms. Laughton applied for a restraining order against Groves.[54] On many instances, the couple broke up and got back together. Groves was often the one pleading to get back together with Ms. Laughton. On one occasion, when Ms. Laughton was considering Groves pleas, she noted:

> "Whether we get back together in a relationship or not and even if we're just friends and we're having sex, there's to be no more discussion of sex with children if we end up having kids, we're not doing that either and they'll be no more discussion of sex with your parents. I'm going down the straight and narrow."[55]

On another occasion, Groves assured Ms. Laughton that what they were doing was okay by telling Ms. Laughton that "God is okay with what they were doing."[56]

Besides distancing herself, Ms. Laughton attempted to stop Ms. Grove's behavior in other ways. For example, in August of 2022, Ms. Laughton attempted to bring awareness to the issue by "publicly accus[ing] Lindsay of molesting children and [asked] people to contact Lindsay's workplace," on Ms. Laughton's podcast.[57] In a post on the podcast's page, Laughton noted that,

---

[53] *See*, 095111866108 (Government's motion for revocation of release) at 12.
[54] *Id.*
[55] Text message log at 25.
[56] See page 12 of the *Government's Motion for Revocation of Release Order*.
[57] See page 11 of the *Government's Motion for Revocation of Release Order*.

"Lindsay has a history of being attracted to minors and has taken images of children in inappropriate situations," and provided a link to the location that Lindsay worked so people could file complaints.[58] This is where Groves skillfully lied to the police by telling them Ms. Laughton's accusations were false, which lead to Ms. Laughton's unwarranted arrest for "False E-911 Information."[59] Note that Groves later pled guilty to the same crimes she told police were false accusations.

In another instance, Ms. Laughton contacted the police herself to report that "she received inappropriate images of children from her "ex," Lindsay Groves.[60] Ms. Laughton's disclosure and subsequent cooperation with law enforcement led to the current charges. Unlike Ms. Laughton, Groves consistently lied to investigators projecting the facade of an innocent, loving, daycare provider. She initially denied any connection to the inappropriate images.[61] When pressed further, she fabricates a story of "accidentally" taking the photos and "forgetting" that she took them.[62] When pressed even further, investigators were able to come closer to the truth as Groves finally admitted to taking the photos, however, she continues to blame her behavior on Ms. Laughton's influence.[63]

Groves' last act of manipulation in her string of fabrication was in front of this Court. Just as she had manipulated police officers into believing that Ms. Laughton's accusations were false, she continued her well-practiced facade of a shy, innocent, caretaker who has been manipulated by Ms. Laughton. She persisted in her claim that, despite being the one who exploited her authority to take advantage of toddlers placed under her care, she was manipulated into doing so.

---

[58] Presentence Investigation Report at 28.
[59] Presentence Investigation Report at 27-28. For more information on this situation see page 8-9 of this memo.
[60] Presentence Investigation Report at 5.
[61] See, 095111866110 (Groves police interview) at 25.
[62] Id. at 25-27.
[63] Id. at 28-29.

There are roughly 500,000 professional daycare providers in America, and it is very likely that not a single one of them can be "persuaded" to do what Groves did.[64] Groves did what she did very likely because she had the proclivity, the opportunity, and the audacity to do it. Ms. While Laughton engaged in a text banter about the sick fantasies, words alone could not accomplish the crime, it was Grove who took action. Without Grove's willingness to plan and execute the horrific acts, there would be neither a crime nor innocent victims.

Ms. Grove's consistent history of lying and deflecting responsibility compared to Ms. Laughton's history of attempting to alert authorities and being cooperative with the police establishes an important difference between the two individuals. Ms. Laughton has taken accountability and is remorseful,[65] whereas Groves has displayed consistent evasion, finger-pointing, and unwilling to fully own up to what she did.

### A. Illustration of Both Defendants' Actions

| Groves | Ms. Laughton |
|---|---|
| Took multiple images of minor victims while in care of them through her daycare job. | Admittedly encouraged co-defendant to take inappropriate images of the minor victims. |
| Continuously assured the co-defendant that what they were doing was okay. | Tipped police officers off about the criminal activity happening at the daycare in 2022. |
| Lied to police officers about her involvement with the crime when Ms. Laughton tipped officers off about her behavior at the daycare in 2022. | Tipped police officers off about Groves' distribution of inappropriate images. |
| Lied to police officers about her involvement with the crime in 2023, by saying that the photos were "accidental," | Worked honestly with police officers and voluntarily consented to pre-trial detention. |

---

[64] *See* https://www.ibisworld.com/united-states/number-of-businesses/day-care/1618/#RelatedIndustries, for daycare statistics in the US.

[65] See https://www.psychologytoday.com/us/blog/the-time-cure/201809/remorse, for definition and understanding of remorse. "True remorse is never just regret over consequence; it is regret over motive."

| | |
|---|---|
| or that she did not "remember" taking them. | |

## B. Ms. Grove's Manipulation In Her Relationship with Ms. Laughton

In November of 2014, Ms. Laughton and Lisa began dating Lindsay Groves in a polyamorous relationship.[66] The relationship was very taxing on Ms. Laughton's mental health. In 2015, shortly after Ms. Laughton attempted to take her life, she was admitted to another hospital for suicidal ideation.[67] There, she indicated interpersonal conflicts with her girlfriend as one of her main stressors.[68] Around this time, Ms. Laughton started experiencing seizures, which were later diagnosed as anxiety induced seizures.[69] Ms. Laughton and Groves would often get into text arguments, in which Groves would threaten to break up with her.[70] In one argument, Groves threatened to kill herself. Worried, Ms. Laughton contacted the police to perform a wellness check on Groves.[71] Groves later manipulated Ms. Laughton's act of care into something it was not. She filed an active stalking order against Ms. Laughton in which she "reported that the defendant contacted 911 claiming that [she] was going to hurt herself," that Ms. Laughton referred to her as her wife instead of her girlfriend on Ms. Laughton's podcast, and that Ms. Laughton asked podcast listeners to report her for molesting children at her workplace.[72] Groves was so conniving that she convinced the police department that her allegations were untrue, resulting in Ms. Laughton's charges of stalking and false E-911.[73] These allegations forced Ms.

---

[66] Presentence Investigation Report at 34.
[67] *Id*. at 38.
[68] *Id*. at 38-39.
[69] *Id*. at 36.
[70] *Id*. at 34.
[71] *Id.* at 26.
[72] *Id*. at 28.
[73] *Id*.

13

Laughton to resign from office.[74] This was not the only time Groves attempted to manipulate the police department against Ms. Laughton. In 2021, Groves falsely reported fraudulent activity on her credit card, telling police officers Ms. Laughton was using her card without her permission from 2019-2020.[75] The police observed inconsistencies with Groves story and recognized that Groves did in fact have knowledge of each purchase she alleged were fraudulent.[76]

In addition to using the police as an abuse tactic, Groves was also financially, verbally, and physically abusive towards both Ms. Laughton and Lisa. From 2018 to 2019, Ms. Laughton and Lisa were experiencing homelessness, and Groves helped the two secure a home.[77] Following her financial aid, Lindsay became "cold" towards Lisa.[78] Additionally, Groves would often belittle Ms. Laughton.[79] During arguments, Groves would get violent. On different occasions, Groves scratched Ms. Laughton's face, threw a small refrigerator at her, pushed her into a bathtub and punched her in the mouth.[80]

### C. The Government's Assessment of Relative Culpability of the Co-Defendants is Inconsistent and Wrong

For three reasons, the government's argument in its sentencing memo, that Ms. Laughton is more culpable than Groves, fails. First, the government's assertion is not supported by the facts. Second, the assertion is inconsistent with the principles of sentencing captured by the sentencing guidelines. Third, the assertion is inconsistent with the government's own position taken in this very case during Groves' detention proceedings.

---

[74] *Id.* at 42.
[75] *Id.* at 34.
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.* at 35.
[80] *Id.*; Stacie Laughton Mitigation report at 28-29.

1.  **The Government's Assertion that Ms. Laughton is the More Culpable Actor is Inconsistent with the Facts of the Case**

The assertion in the government's sentencing memo that Ms. Laughton is the more culpable actor is contradictory to the facts. Groves took the inappropriate images and assured Ms. Laughton that there was nothing morally wrong with what they were doing. Groves took the images on three different occasions and sent them to Ms. Laughton; the first time without being prompted to do so. Without this action there could be no crime.

Furthermore, Groves perpetuated the crime by continuing to assure Ms. Laughton that their behavior was not offensive, covering up her actions, lying to her supervisors and the police in order to remain in her position as a caretaker of the children. This case is about the act of producing the images and distributing them. Groves is the one who did both.

2.  **The Government's Assertion that Ms. Laughton is the More Culpable Actor is Inconsistent with Sentencing Guidelines**

The sentencing guideline is designed to promote fairness in sentencing. The enhancement provisions allow the Court to craft a sentence based on the specific conduct of each individual defendant. In cases involving multiple defendants, the application of the enhancement provisions results in hierarchy of sentences based on the culpability of each defendant. A defendant who receives a higher offense level from the application of the enhancement is ordinarily more culpable than a co-defendant with a lower offense level for the same crime.

Here, Groves received two critical sentencing enhancements that were not applied against Ms. Laughton. Specifically, Groves received enhancements for abuse of position of authority and engaging in repeated patterns of dangerous conduct.

The government agrees that the crime would not have occurred without the blatant and horrifying breach of trust and abuse of position of authority by Groves. Due to this horrific abuse of a position of authority Groves received a sentence enhancement that Ms. Laughton could not receive. The application of the principle of fairness in this case is simple: a higher sentence must be given to the co-defendant with heightened involvement in the crime, who breached a duty of care and who abused a position of trust.

In addition to sentence enhancements, the Court considers other factors such as level of criminal involvement, cooperation with law enforcement, and remorse. *United States v. Romero*, 906 F.3d 196, 212-13 (1st Cir. 2018) (relied on the factor of "cooperation with the government," in upholding a disparate sentence between the defendant and four other codefendants because he failed to cooperate with the government).

Ms. Laughton has exemplified her remorse by her continued cooperation with law enforcement.  Similar to the codefendant in *Romero*, Ms. Laughton has been cooperative with the government by tipping officers that the crimes were being committed, being honest about her role in the current charges, and voluntarily consented to pre-trial detention. The same cannot be said for Groves; instead, she has continuously lied to officers about her involvement with the current charges, and she continues her deceit before the court by continuing her fraudulent role of a shy, caring daycare provider. In *Romero*, the codefendant's disparity in cooperation justified a disparity in their sentencing. 906 F.3d at 212.

> **3. The Government's Assertion that Ms. Laughton is the More Culpable Actor is Inconsistent with the Government's Very Own Position Asserted in Groves' Detention Proceeding.**

The government's recent position that Ms. Laughton was the more prominent actor is inconsistent with their prior position asserted in the government's motion for Groves' pre-trial

detention proceeding. In that document, the government explicitly asserts that Groves is "at the very least an equal participant in the sexual exploitation of children, reasoning that Groves "was the one with the access to children, who no one suspected of any wrongdoing even when, first, a four-year-old child" came forward. In this document, the government also recognizes "the defendant's ability to perpetrate these heinous crimes without suspicion and then convince her employers and police that *she* was the victim." Further, the government recognizes Groves' role in assuring Ms. Laughton that what they are doing is okay, "in other texts, the defendant comforts Laughton by telling her that God is okay with what they are doing." This document reveals the government's belief in each of the defendant's respective roles in perpetuating the crime, however, their assertion in Ms. Laughton' sentencing memorandum that she was the more prominent actor is contradictory with the government's very own prior beliefs. The government cannot flip their belief whenever it is convenient for their position at that time, they must be held to consistency.

### III.    GUIDELINE PROVISION

The applicable guideline range in extremely excessive. The guideline range for total offense level  43 and a criminal history category of III is life. However, because the statutorily authorized maximum sentences are less than the minimum of the applicable guideline range; the guideline term of imprisonment is 1,080 months (90 years). USSG §5G1.2(b).

The sentencing guideline is one of the factors at sentencing and that the Court need not follow it nor give it more weight than the other factors.  The Court is only required to give "some weight" to the advisory guidelines, as it would to the other 18 U.S.C. § 3553(a) factors.  *Gall v. United States,* 552 U.S. –, 2007 WL 4292116 (Dec. 10, 2007).  In *Gall*, the Supreme Court

"reject[ed] an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." The Court also "reject[ed] the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." The Court made it clear that any attempt to give special weight to the sentencing guideline is contrary to its holding in *Booker,* which means the guidelines are advisory. S*ee also Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).

The Court has sentenced Groves to The Court has sentenced Groves to 262 months imprisonment on Counts 1-3 and 240 months imprisonment on Count 4 to be served concurrently, and 5 years supervised release to be served concurrently on each count. Although Groves had a higher total offense level than Ms. Laughton, the applicable offense level was adjusted down to 43, as in Ms. Laughton's case, pursuant to Chapter 5, Part A (comment n.2). On the Sentencing Table, 262 months falls under Offense Level 39, Criminal History Category I. The recommended sentence here is calculated by taking account of the sentence imposed against Groves and subtracting the four-level enhancement applied exclusively to Groves. 210 months imprisonment is falls under Offense Level 39 and Criminal History Category II.

Although Ms. Laughton's Criminal History technically falls under Category III, the Court should apply Criminal History Category II. The adjustment is necessary to avoid the injustice of counting the Stalking and False E-911 Information charges that were associated with Groves' manipulation of justice. These charges count against Ms. Laughton although subsequent information revealed that Groves lied to officers when pressing these charges against Ms. Laughton. Ms. Laughton has already suffered the injustice that from Groves' manipulation of the system. The Court should discount the point counted for that crime, which would reduce the

criminal history category to category II. The applicable sentencing range for Total Offense Level 36 and Criminal History Category II is 210-262 months.

IV.     **The Need for a Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public from Further Crimes**

A sentence of 210-months imprisonment followed by 5 years of supervised release is a lengthy sentence that provides sufficient punishment for the crime and reflects the seriousness of the offense. The effect of this federal prosecution and the lengthy prison sentence has served the purpose of promoting respect for the law. Ms. Laughton will be placed under federal supervision for a significant period.

### A.  Low Likelihood of Recidivism

Ms. Laughton's recidivism rate is extremely low for a multitude of factors. Firstly, according to Dr. Joseph Plaud, the results of his comprehensive psychological evaluation indicated that Ms. Laughton's sexual interest pattern is exclusive to adult females, meaning she is not sexually attracted to minors according to this scientific test.[81] In support of this finding, Ms. Laughton has not shown a sexual interest in children, illustrating that this behavior is more reflective of her unhealthy attachment to Groves and fear of being alone.[82]

Secondly, according to the Federal Sentencing Commission an increased age at the time of sentencing correlates to a lower recidivism rate. More specifically, among all offenders under

---

[81] Dr. Joesph Plaud's psychology examination on Ms. Laughton at 28.
[82] Stacie Laughton Mitigation Report at 34-35.

age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent." Ms. Laughton, being 42 at the time of sentencing puts her at an age much closer to the low recidivism rate of 9.5%.[83]

Lastly, educational attainment affects recidivism rates. According to the Federal Sentencing Commission, offenders with less than a high school education are most likely to recidivate (60.4%), whereas the recidivism rate for offenders with college degrees is 19.1%.[84] Ms. Laughton has received her associate's degree in culinary school, making her amongst the group that has a college degree and therefore at the 19.1% recidivism rate.

## V. CONCLUSION

For the foregoing reasons, the defendant requests that the Court to impose a sentence of 210 months of imprisonment, followed by five (5) years of supervised release, on each of the 3 counts to be served concurrently.

Stacie-Marie Laughton
By her counsel

/s/ *Derege B. Demissie*
DEREGE B. DEMISSIE
DEMISSIE & CHURCH
88 Broad Street, Suite 101
Boston, MA 02110
Ph: (617) 501-7655
dd@demissiechurch.com

June 15, 2026

---

[83] *See*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf, at 23.
[84] *See*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf, at 24.

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 16, 2026.

/s/ *Derege B. Demissie*
DEREGE B. DEMISSIE